STEVEN LEIBOWITZ; THOMAS STANDISH; AND ECKER & STANDISH, CHARTERED, PETITIONERS, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK, AND THE HONORABLE WILLIAM O. VOY, DISTRICT JUDGE, FAMILY COURT DIVISION, RESPONDENTS, AND DEENA LEIBOWITZ, REAL PARTY IN INTEREST.

No. 39683

November 3, 2003                               78 P.3d 515

---

[65]*Cf. People v. Hickey,* 303 N.W.2d 19, 21 (Mich. Ct. App. 1981); *A Juvenile v. Com.,* 465 N.E.2d 240 (Mass. 1984).

*Ecker & Standish* and *Thomas J. Standish,* Las Vegas; *Lemons Grundy & Eisenberg* and *Robert L. Eisenberg,* Reno, for Petitioners.

*Dickerson, Dickerson, Consul & Pocker* and *Robert P. Dickerson,* Las Vegas, for Real Party in Interest.

*Molof & Vohl* and *Robert C. Vohl,* Reno, for Amici Curiae Sierra Nevada Association of Paralegals, National Association of Legal Assistants, and National Association of Legal Secretaries of Washoe County.

526

Before the Court EN BANC.

## OPINION

By the Court, BECKER, J.:

The law firm of Ecker & Standish was disqualified from representing petitioner Steven Leibowitz pursuant to our decision in *Ciaffone v. District Court*,[1] which addressed imputed disqualification based upon employment of a nonlawyer employee who had access to confidential or privileged information of an adverse party during the course of the employee's prior employment. For the reasons set forth below, we determine that screening is permissible for nonlawyer employees, clarify in part and overrule in part our decision in *Ciaffone* and grant the petition.

### FACTS

This petition for a writ of mandamus arises out of a divorce proceeding. Steven and Deena Leibowitz were married in 1986. The parties later separated, and Deena filed a complaint for divorce in February 2000. Deena hired the law firm of Dickerson, Dickerson,

[1]113 Nev. 1165, 945 P.2d 950 (1997).

Consul & Pocker (DDCP) to represent her. Steven retained the law firm of Ecker & Standish (ES) to represent him in the divorce proceedings.

After a number of contested hearings, the district court entered a final judgment resolving all the parties' property, custody, and other divorce issues. The final judgment was entered on July 26, 2001. Both Steven and Deena appealed the final judgment and the appeal is pending in this court.

Later in the summer of 2001, while the appeal was pending, Steven filed a motion seeking to modify child custody and visitation. The district court certified its inclination to consider the motion. On December 13, 2001, Steven filed a motion to remand the issue to the district court.[2] Deena opposed the motion.

After filing the motion to remand, ES advised DDCP that ES had hired Haunani Magalianes, a former DDCP employee, as a legal assistant. Magalianes had performed limited work on Deena's file while employed at DDCP. During discussions regarding possible disqualification, ES discovered that one of its former employees, Pollie J. Baker, worked at DDCP for periods of time between June 2001 and April 2002.

*Magalianes evidence*

On February 14, 2002, attorney Howard Ecker advised DDCP via letter that ES had hired Magalianes. With respect to the Leibowitz case, Ecker indicated that Magalianes told him she might have revised the initial complaint in the divorce proceedings while working at DDCP. However, Magalianes advised Ecker that she did not believe she had obtained any privileged information as a result of her work in the Leibowitz matter.

DDCP employed Haunani Magalianes in its domestic division until May 26, 2000. Thereafter, Magalianes transferred to DDCP's civil division until approximately April 2001. According to Magalianes, during her employment in DDCP's domestic division, she had three contacts with the Leibowitz case. First, Magalianes took the initial phone call from Deena regarding potential representation by DDCP (*i.e.*, name, phone number, basic facts, and type of case). Second, Magalianes prepared a short memorandum to attorney Robert P. Dickerson that contained the initial information obtained by Magalianes. Lastly, Magalianes prepared a substitution of attorneys form and a transmittal letter to Deena's former attorney regarding the substitution. DDCP asserts Magalianes also participated in a meeting involving a child custody dispute on May 26, 2000. Magalianes denies participating in this meeting. DDCP's billing records do not reflect Magalianes' atten-

---

[2]*See Huneycutt v. Huneycutt*, 94 Nev. 79, 575 P.2d 585 (1978).

dance at the meeting, although one of the attorneys present filed an affidavit indicating Magalianes was present during a phone call with opposing counsel and at a conference among Deena's counsel after the telephone conversation. The telephone call and conference involved a dispute between Deena and Steven over who would be entitled to have custody during the Memorial Day weekend.

As a condition of her employment, and in the course of her employment with ES, Magalianes was screened from any contact with the Leibowitz case. Specifically, Magalianes had no access to actual or computer files and was prohibited from conversing with law firm personnel regarding the Leibowitz matter.

### Baker evidence

ES employed legal assistant Pollie J. Baker from October 2000 until mid-January 2001. Baker worked primarily for ES attorney Ed Kainen. During the period of Baker's employment, ES represented Steven in the divorce proceedings. Attorney Thomas J. Standish testified that he did the majority of work on the Leibowitz divorce, but he had some help from Kainen. Baker had access to the Leibowitz files, but Baker averred that she did not have any contact with the Leibowitz case while employed at ES. ES presented evidence that Baker had actual involvement with the case.

Around June 2001, Baker went to work for DDCP and Baker worked there for several months. She left DDCP for a short period of time and returned in late 2001. Baker ended her relationship with DDCP on April 24, 2002. DDCP indicated that it did not inform ES about Baker's employment at the time because it was unaware of Baker's previous employment with ES. Baker's resume did not disclose her employment with ES.

ES filed a motion asking the district court to determine the disqualification issues. According to ES, it indicated if *Ciaffone* mandated disqualification whenever a nonlawyer employee had mere access to privileged or confidential information, then both firms should be disqualified. However, ES argued that *Ciaffone* only required disqualification when an employee actually obtained privileged or confidential information. Under this interpretation of *Ciaffone,* ES asserted that neither firm should be disqualified. DDCP's response argued that *Ciaffone* required disqualification of both firms.

The district court concluded that *Ciaffone* mandated automatic disqualification whenever a nonlawyer employee had access to an adverse party's privileged or confidential information during employment by that party's attorneys. The district court also found that Magalianes had actual communication with Deena during her employment with DDCP, inferring that Magalianes may have obtained privileged or confidential information. As to Baker, the district court concluded that she did not view or have access to any of

the Leibowitz files while employed at ES.[3] The district court disqualified ES but declined to disqualify DDCP. This writ petition was then filed.

## DISCUSSION

Petitioners seek a writ of mandamus compelling the district court to vacate its order disqualifying the law firm of ES from further representation of Steven. A writ of mandamus is an extraordinary remedy that will not issue if the petitioner has a plain, speedy, and adequate remedy at law.[4] Whether to consider a petition for mandamus is entirely within the discretion of this court.[5] The writ is generally issued "to compel the performance of an act" that the law requires as a duty resulting from an office, trust or station, or to control an arbitrary or capricious exercise of discretion.[6]

This court has previously concluded that mandamus is an appropriate remedy in lawyer disqualification matters.[7] In addition, we have said that "[d]istrict courts are responsible for controlling the conduct of attorneys practicing before them, and have broad discretion in determining whether disqualification is required in a particular case."[8] However, "parties should not be allowed to misuse motions for disqualification as instruments of harassment or delay."[9]

### Ciaffone *clarified in part*

First, petitioners contend the district court misapplied this court's decision in *Ciaffone*. They assert that *Ciaffone* does not automatically require disqualification of lawyers whenever they hire a nonlawyer who had access to an adverse party's privileged or confidential information during previous employment. Petitioners argue that *Ciaffone* stands for the proposition that the disqualification remedy is only available if the district court first determines

[3]The district court apparently overlooked the parties' undisputed statements that Baker had access to the Leibowitz files.

[4]*See* NRS 34.170.

[5]*Smith v. District Court,* 107 Nev. 674, 677, 818 P.2d 849, 851 (1991).

[6]NRS 34.160; *see Wardleigh v. District Court,* 111 Nev. 345, 350, 891 P.2d 1180, 1183 (1995); *Round Hill Gen. Imp. Dist. v. Newman,* 97 Nev. 601, 637 P.2d 534 (1981).

[7]*Cronin v. District Court,* 105 Nev. 635, 639 n.4, 781 P.2d 1150, 1152 n.4 (1989).

[8]*Brown v. Dist. Ct.,* 116 Nev. 1200, 1205, 14 P.3d 1266, 1269 (2000); *Cronin,* 105 Nev. at 640, 781 P.2d at 1153.

[9]*Brown,* 116 Nev. at 1205, 14 P.3d at 1270.

that a lawyer's employee gained privileged and confidential information about an adverse party as a result of former employment. Petitioners contend that mere access to the adverse party's file during the former employment is insufficient to warrant disqualification. We agree.

*Ciaffone* recognized that the prohibitions against the unauthorized disclosure of confidential information encompassed in SCR 156 and 159(2) apply to an attorney's nonlawyer employees through SCR 187, which requires lawyers to hold their nonlawyer employees to the same professional standards applicable to attorneys.[10] We held that the imputed disqualification requirements for attorneys and firms under SCR 160 apply to nonlawyer employees of an attorney or firm.[11] Thus, if a nonlawyer possesses privileged information, imputed disqualification should apply whenever the nonlawyer accepts employment with a firm or attorney who represents a client with a materially adverse interest to the former client.

However, despite the statements in the opinion indicating that imputed disqualification does not apply if the nonlawyer employee did not obtain confidential information in the prior employment,[12] the facts in *Ciaffone* infer that mere exposure to a client's file is sufficient to warrant disqualification. In *Ciaffone,* the nonlawyer's involvement with the prior client's case was limited to some work in a secretarial, word processor capacity.[13] The opinion is silent on whether or not this exposure related to privileged or confidential information. Instead, the opinion seems to suggest that any exposure to a client's file is sufficient to invoke imputed disqualification. We therefore take this opportunity to clarify that the imputed disqualification standards of SCR 160(2) do not apply simply because a nonlawyer employee was exposed, or had access to, a former client's file. The rule only applies when the nonlawyer employee acquires privileged, confidential information.

### Ciaffone *overruled in part—screening permitted*

In addition to holding that the imputed disqualification standards of SCR 160(2) apply to nonlawyer employees of attorneys, *Ciaffone* also addressed whether disqualification could be avoided by the use of screening procedures. We concluded that screening was not permitted under the rule for attorneys, and therefore, it should not be permitted for nonlawyers.

---

[10]*Ciaffone,* 113 Nev. at 1168, 945 P.2d at 952-53.

[11]*Id.* at 1169-70, 945 P.2d at 953.

[12]*Id.* at 1169 n.3, 945 P.2d at 953 n.3.

[13]*Id.* at 1166-67, 945 P.2d at 951-52.

Petitioners and amici[14] urge us to overrule that portion of *Ciaffone* and permit nonlawyer screening. They respectfully assert that this court misapprehended the weight of authority on this issue. We agree.

In *Ciaffone*, we were asked to adopt screening for nonattorney employees based upon the rationale of an American Bar Association interpretation of the ABA Model Rules of Professional Conduct.[15] The ABA opinion reasoned that screening should be permitted for nonlawyer employees because their employment opportunities and mobility are more substantially impacted by imputed disqualification than that of attorneys.[16] We rejected this argument and said it was "roundly criticized." We also inferred that a majority of courts had rejected nonlawyer screening and cited to a law review article by M. Peter Moser in support of these statements.[17] In fact, Mr. Moser did not criticize nonlawyer screening. He pointed out that a majority of jurisdictions permit nonlawyer screening and argued that screening should also be permitted for lawyers.[18]

As pointed out by the amici's brief, the majority of professional legal ethics commentators, ethics tribunals, and courts have concluded that nonlawyer screening is a permissible method to protect confidences held by nonlawyer employees who change employment.[19] Nevada is in a minority of jurisdictions that do not allow screening for nonlawyers moving from private firm to private firm.[20]

---

[14]Amici are the Sierra Nevada Association of Paralegals, the National Association of Legal Assistants, and the National Association of Legal Secretaries of Washoe County.

[15]113 Nev. at 1169, 945 P.2d at 953.

[16]*See* ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1526 (1988) [hereinafter Informal Op. 1526] (imputed disqualification arising from change in employment by a nonlawyer).

[17]*Ciaffone*, 113 Nev. at 1169-70, 945 P.2d at 953.

[18]M. Peter Moser, *Chinese Walls: A Means of Avoiding Law Firm Disqualification When a Personally Disqualified Lawyer Joins the Firm*, 3 Geo. J. Legal Ethics 399, 406-07 (1990).

[19]*Restatement (Third) of the Law Governing Lawyers* § 123 cmt. f (2000) (approving screening for nonlawyer employees to protect client confidences); 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 14.11 (3d ed. 2003) (observing the imputation rules do not strictly apply to nonlawyer employees to the extent of allowing screening); Model Rules of Prof'l Conduct R. 1.10 cmt. 4 (2002) (stating that imputed disqualification does not apply to nonlawyer employees, who may be screened to protect client's interests).

[20]*See, e.g., Zimmerman v. Mahaska Bottling Co.*, 19 P.3d 784 (Kan. 2001) (adopting this court's reasoning in *Ciaffone* in concluding that professional conduct rules apply to nonlawyer employees and screening devices, inapplicable to lawyers, are equally inapplicable to nonlawyer employees). *See generally* J. Anthony McLain, *Imputed Disqualification of Law Firms When Nonlawyer Employees Change Firms*, 63 Ala. Law. 94, 95 (2002).

Imputed disqualification is considered a harsh remedy that "should be invoked if, and only if, the [c]ourt is satisfied that real harm is likely to result from failing to invoke it."[21] This stringent standard is based on a client's right to counsel of the client's choosing and the likelihood of prejudice and economic harm to the client when severance of the attorney-client relationship is ordered.[22] It is for this reason that the ABA opined in 1988 that screening is permitted for nonlawyer employees, while conversely concluding, through the Model Rules of Professional Conduct, that screening is not permitted for lawyers.[23] The ABA explained that "additional considerations" exist justifying application of screening to nonlawyer employees (*i.e.,* mobility in employment opportunities which function to serve both legal clients and the legal profession) versus the Model Rule's proscription against screening where lawyers move from private firm to private firm.[24] In essence, a lawyer may always practice his or her profession regardless of an affiliation to a law firm. Paralegals, legal secretaries, and other employees of attorneys do not have that option.

We are persuaded that *Ciaffone* misapprehended the state of the law regarding nonlawyer imputed disqualification. We therefore overrule *Ciaffone* to the extent it prohibits screening of nonlawyer employees.

When a law firm hires a nonlawyer employee, the firm has an affirmative duty to determine whether the employee previously had access to adversarial client files. If the hiring law firm determines that the employee had such access, the hiring law firm has an absolute duty to screen the nonlawyer employee from the adversarial cases irrespective of the nonlawyer employee's actual knowledge of privileged or confidential information.

Although we decline to mandate an exhaustive list of screening requirements, the following provides an instructive minimum:

---

[21]*Hayes v. Central States Orthopedic,* 51 P.3d 562, 565 (Okla. 2002).

[22]*See Cronin,* 105 Nev. at 642, 781 P.2d at 1154; *see also Hayes,* 51 P.3d at 565.

[23]Informal Op. 1526, *supra* note 16 (imputed disqualification arising from change in employment by a nonlawyer); *see also Restatement (Third) of the Law Governing Lawyers* § 123 cmt. f (2000) (approving screening for nonlawyer employees to protect client confidences); 1 Hazard & Hodes, *supra* note 19, § 14.11 (observing the imputation rules do not strictly apply to nonlawyer employees to the extent of allowing screening); Arthur Garwin, *Confidentially Speaking: Paralegal Hired from Opposing Firm May Need to be Isolated to Avoid Conflicts,* A.B.A. J., Oct. 1998, at 78.

[24]Informal Op. 1526, *supra* note 16.

1. "The newly hired nonlawyer [employee] must be cautioned not to disclose any information relating to the representation of a client of the former employer."

2. "The nonlawyer [employee] must be instructed not to work on any matter on which [he or] she worked during the prior employment, or regarding which [he or] she has information relating to the former employer's representation."

3. "The new firm should take . . . reasonable steps to ensure that the nonlawyer [employee] does not work in connection with matters on which [he or] she worked during the prior employment, absent client consent [*i.e.,* unconditional waiver] after consultation."[25]

In addition, the hiring law firm must inform the adversarial party, or their counsel, regarding the hiring of the nonlawyer employee and the screening mechanisms utilized. The adversarial party may then: (1) make a conditional waiver (*i.e.,* agree to the screening mechanisms); (2) make an unconditional waiver (eliminate the screening mechanisms); or (3) file a motion to disqualify counsel.

However, even if the new employer uses a screening process, disqualification will always be required—absent unconditional waiver by the affected client—under the following circumstances:

1. "[W]hen information relating to the representation of an adverse client has in fact been disclosed [to the new employer]";[26] or, in the absence of disclosure to the new employer,

2. "[W]hen screening would be ineffective or the nonlawyer [employee] necessarily would be required to work on the other side of a matter that is the same as or substantially related to a matter on which the nonlawyer [employee] has previously worked."[27]

Once a district court determines that a nonlawyer employee acquired confidential information about a former client, the district court should grant a motion for disqualification unless the district court determines that the screening is sufficient to safeguard the former client from disclosure of the confidential information. The

---

[25]*In re Bell Helicopter Textron, Inc.,* 87 S.W.3d 139, 145-46 (Tex. App. 2002); *see also* Informal Op. 1526, *supra* note 16.

[26]*In re Bell Helicopter,* 87 S.W.3d at 146; *see also* Informal Op. 1526, *supra* note 16.

[27]*In re Bell Helicopter,* 87 S.W.3d at 146; *see also* Informal Op. 1526, *supra* note 16.

district court is faced with the delicate task of balancing competing interests, including: (1) "the individual right to be represented by counsel of one's choice," (2) "each party's right to be free from the risk of even inadvertent disclosure of confidential information," (3) "the public's interest in the scrupulous administration of justice," and (4) "the prejudices that will inure to the parties as a result of the [district court's] decision."[28]

To determine whether screening has been or may be effective, the district court should consider: (1) "the substantiality of the relationship between the former and current matters," (2) "the time elapsed between the matters," (3) "the size of the firm," (4) "the number of individuals presumed to have confidential information," (5) "the nature of their involvement in the former matter," (6) "the timing and features of any measures taken to reduce the danger of disclosure," and (7) whether the "old firm and the new firm represent adverse parties in the same proceeding, rather than in different proceedings" because inadvertent disclosure by the nonlawyer employee is more likely in the former situation.[29]

### Application to case at bar

As to Baker, the record supports the district court's finding that she did not obtain confidential information about Steven's case while employed by ES. At most, the record reflects she had access to Steven's files because she worked in the ES office and she could have typed something for attorney Kainen when he performed some services for Steven. Given our clarification of *Ciaffone,* we conclude the district court did not err in refusing to disqualify DDCP.

Turning to Magalianes and applying the factors identified above, the record reflects that Magalianes worked in the domestic division of DDCP for approximately one month of the time that DDCP handled the Leibowitz matter. During that period, she did perform work on Deena's case. She spoke with Deena, and the district court findings infer that she may have received some confidential information during the conversation. The district court did not resolve the factual dispute over Magalianes' presence at the Memorial Day custody conference; however, for purposes of our analysis, we assume that she was present. The affidavits of Deena's counsel however, do not clearly establish that Magalianes was

[28]*Brown,* 116 Nev. at 1205, 14 P.3d at 1269-70.

[29]*In re Bell Helicopter,* 87 S.W.3d at 146.

privy to any confidential information. It appears that much of the conference involved telephone conversations with opposing counsel as the attorneys attempted to reach a resolution on visitation that both parties could accept. It is clear that the only subject of the conference was the Memorial Day visitation. Almost two years elapsed between the conclusion of Magalianes' involvement with the Leibowitz case until the time of her employment by ES. ES is a small firm, and, finally, the old and new firms represent adverse parties in the same proceeding.

Balancing Deena's interest in preventing possible disclosure of confidential information[30] with Steven's interest in retaining the attorney who has represented him for over two years, and the entirety of the divorce proceedings, we conclude that ES should not be disqualified. Magalianes' contacts with Deena were brief and, according to the record, consisted mainly of routine information with some possible confidential information. The issues relating to the Memorial Day weekend have long since been resolved, and there is no indication in the record that any confidential information discussed at that conference related to anything but the weekend custody dispute. Although ES is a small firm, there is no evidence that Magalianes would be, by the nature of the firm, forced to work on the Leibowitz matter. Moreover, given the length of time ES represented Steven, the fact that a final judgment has been issued and Magalianes' involvement occurred early in the proceedings, the public's interest in the administration of justice is not significantly impacted in this case. Finally, Steven would suffer extreme prejudice if he had to retain a new attorney this late in the proceedings, and disqualification is not merited given Magalianes' marginal involvement with the matter while employed with DDCP.[31]

## CONCLUSION

Based on the foregoing, we overrule *Ciaffone*'s prohibition against screening for nonlawyer employees, clarify that mere opportunity to access confidential information does not merit disqualification and conclude that the district court erred in disqualifying the law firm of ES from representing Steven Leibowitz. Accordingly, we grant the petition for a writ of mandamus. The

---

[30]There are no allegations that any confidential information was actually disclosed.

[31]Because both parties acknowledged that a strict interpretation of *Ciaffone* requires disqualification of both firms, we do not conclude that the district court abused its discretion. We grant the writ because, given our clarification of *Ciaffone* and our decision to permit nonlawyer screening, disqualification is not warranted in this case.

clerk of this court shall issue a writ of mandamus directing the district court to vacate its order disqualifying the law firm of ES.

SHEARING, ROSE and MAUPIN, JJ., concur.

GIBBONS, J., concurring:

I concur with the majority that the petition should be granted. However, I disagree that the hiring law firm must inform the adversarial party, or their counsel, regarding the hiring of the nonlawyer employee and the screening mechanisms utilized. The three instructive minimum screening requirements set forth by the majority are sufficient.

LEAVITT, J., with whom AGOSTI, C. J., agrees, dissenting:

I would deny the petition because the district court properly disqualified the law firm of Ecker & Standish.

I would follow the reasoning in *Ciaffone v. District Court*.[1] In *Ciaffone,* we held that screening was ineffective to prevent disqualification.[2] Additionally, we noted:

> The reasoning [is] . . . that a nonlawyer's employment opportunities or mobility must be weighed against client confidentiality before disqualification occurs. While this approach may appear fairer to the paralegal/secretary, it has been roundly criticized for ignoring the realities of effective screening and litigating that issue should it ever arise. For example, one commentator explained that *a majority of courts have rejected screening* because of the uncertainty regarding the effectiveness of the screen, the monetary incentive involved in breaching the screen, the fear of disclosing privileged information in the course of proving an effective screen, and the possibility of accidental disclosures.[3]

I would deny the petition because the district court simply followed our decision in *Ciaffone.*

---

[1]113 Nev. 1165, 945 P.2d 950 (1997).

[2]*Id.* at 1169, 945 P.2d at 953.

[3]*Id.* at 1169-70, 945 P.2d at 954 (citing M. Peter Moser, *Chinese Walls: A Means of Avoiding Law Firm Disqualification When a Personally Disqualified Lawyer Joins the Firm,* 3 Geo. J. Legal Ethics 399, 403, 407 (1990)).